# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

In re:                                    )
                                          )   Case No. 10-20750-MER
HUGH ALEXANDER WALTON                     )
                                          )   Chapter 7
        Debtor.                           )
                                          )
_____      )
                                          )
LARRY SHANNON                             )   Adversary No. 10-01571-MER
                                          )
        Plaintiff,                        )
                                          )
v.                                        )
                                          )
HUGH ALEXANDER WALTON                     )
                                          )   Signed/Docketed
        Defendant.                        )   June 13, 2012

## ORDER ON SUMMARY JUDGMENT MOTIONS

THIS MATTER comes before the Court on the following motions:

(1)     *Motion for Partial Summary Judgment on Plaintiff's Claim for Revocation
        of Discharge* ("Section 727 Motion") filed by Hugh Alexander Walton on
        February 1, 2012 (Docket No. 120) and the response thereto filed by Larry
        Shannon on February 14, 2012 (Docket No. 125); and

(2)     *Motion for Summary Judgment with Authorities* ("Section 523 Motion")
        filed by Hugh Alexander Walton on February 17, 2012 (Docket No. 126)
        and the response thereto filed by Larry Shannon on March 2, 2012
        (Docket No. 133).

The Court has considered the pleadings on file and the legal arguments
presented by the parties at the hearing held April 2, 2012, and hereby finds and
concludes as follows:

## JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J), because it involves determinations as to the dischargeability of particular debts, and an objection to discharge in the form of a request for revocation of discharge.

## FACTUAL BACKGROUND

This case involves a dispute between the Debtor, Hugh Alexander Walton ("Walton") and Larry Shannon ("Shannon") which arose from their business dealings related to Axcent Sports, LLC ("Axcent").

Axcent was formed in 2003 to design, acquire and distribute bicycle apparel under a license from Descente North America, Ltd. ("Descente").[1]  Walton was the manager of Axcent and Shannon was an investor but was not actively engaged in the day-to-day business of the company.[2]  Shannon funded Axcent with an $850,000 investment.  The amount of Walton's investment is in dispute, as are his and Shannon's respective ownership interests.[3]

Axcent's 2003 Operating Agreement prohibited the manager of Axcent from borrowing in excess of $500,000 without unanimous consent of the members.[4]  According to Shannon, without his consent, Walton caused Axcent to incur debt of $2,432,715 on a credit line with Colorado Business Bank.[5]  Walton admits the debt was incurred, but contends Shannon was aware of and consented to it.  Further, Walton asserts, the debt was secured by substantially all of the assets of Axcent and personally guaranteed by Walton.[6]

---

[1]  Section 523 Motion at 6, ¶ 1; Response at 7.

[2]  *Id.*

[3]  Fifth Complaint, ¶ 16; Answer to Fifth Complaint, ¶ 11.

[4]  Fifth Complaint, ¶ 12; Answer to Fifth Complaint

[5]  Fifth Complaint, ¶ 19.

[6]  Answer to Fifth Complaint, ¶ 14.

As alleged by Shannon, in November 2007, Walton pledged his residence in Boulder, Colorado ("Boulder Property"), to Colorado Business Bank, and the loan was cross-collateralized with the Axcent line of credit. Shannon asserts there was approximately $600,000 in equity in the Boulder Property.[7] For his part, Walton acknowledges Colorado Business Bank held a home equity line of credit secured by a deed of trust on the Boulder Property.[8]

The Axcent business was unsuccessful and, in 2007, with the company deeply in debt and with the five-year Descente license scheduled to expire or to be renewed at the end of the year, Walton began looking for either an additional loan or additional capital to sustain the company.[9] Walton acknowledges he gave Colorado Business Bank a new deed of trust on the Boulder Property, in a third position, in exchange for postponing the foreclosure of the bank's security interest in the assets of Axcent. He denies the security interests held by Colorado Business Bank were cross-collateralized.[10]

In his efforts to sustain the company, Walton sought a loan or an additional investment from Shannon in exchange for a greater ownership interest. Shannon rejected the requests.[11] Walton also sought Shannon's agreement to join with Walton in the guaranty on the loan from Colorado Business Bank, the company's lender.[12] Shannon refused.[13]

According to Walton, when Shannon refused to become a co-guarantor on the loan from Colorado Business Bank, Walton sought a new investor to purchase Shannon's interest in Axcent. However, Shannon did not accept any purchase offers from other potential investors. Shannon disputes this allegation and asserts no buyout

---

[7] Fifth Complaint, ¶ 24-25.

[8] Walton states the residence was owned by him and his wife, Sue Walton. Answer to Fifth Complaint, ¶ 17.

[9] Section 523 Motion at 6-7, ¶¶ 3-4; Response at 7.

[10] Answer to Fifth Complaint, ¶ 17.

[11] Section 523 Motion at 7, ¶ 5; Response at 7.

[12] Walton's statement of facts, which Shannon does not dispute on this point, states, "Walton sought Shannon's agreement to join with Walton." However, it is clear only Walton was liable on the guaranty, and he sought to make Shannon a co-guarantor on the Colorado Business Bank loan.

[13] Section 523 Motion at 7, ¶ 6; Response at 7.

offers were ever presented to him.[14]  Walton and Shannon could not agree on how to continue the business and in late 2007, they began discussing liquidation of Axcent.[15]

On January 14, 2008, Walton and Shannon entered into a Purchase Agreement (the "Purchase Agreement"),[16] in which Walton agreed to purchase Shannon's interest in Axcent.  As consideration for Shannon's interest in Axcent, Walton executed a promissory note in the amount of $400,000, secured by a fourth priority lien on the Boulder Property (the "Promissory Note").  As additional consideration, Shannon and Walton agreed the Operating Agreement of Axcent would be amended to allocate 100% of the tax losses to Shannon for 2007 to the extent of his positive capital account.[17]  The Amendment to the Operating Agreement executed and delivered by Shannon had an effective date of January 1, 2007, and provided that all losses would be allocated to Shannon beginning in 2007 "provided however, that Losses shall not be allocated pursuant to this paragraph to the extent such allocation would cause any Member to have or to increase a deficit Capital Account at the end of such taxable year."[18]

Shortly thereafter, Walton, as sole owner, caused Axcent to sell its assets, including accounts receivable, inventory, and purchase orders in process to Veltec Sports, LLC ("Veltec") or its subsidiary, Pacific Crest Sports, pursuant to a Purchase and Sale Agreement dated January 24, 2008 (the "Veltec Agreement").[19]  In the Veltec Agreement, Veltec agreed to:  a) collect Axcent's receivables for a fee of 15% of the amounts collected; b) purchase the inventory of Axcent; and c) process Axcent's existing purchase orders in exchange for a fee based on the gross profits realized.  All amounts due to Axcent under the Veltec Agreement were to be paid to Colorado Business Bank to retire Axcent's debt.[20]  Axcent completed the sale of assets to Veltec

---

[14]  Section 523 Motion at 7, ¶ 7; Response at 7, ¶ 7.

[15]  Fifth Complaint, ¶ 2; Answer to Fifth Complaint, ¶ 15.

[16]  According to Walton, the Purchase Agreement had an "effective date" of December 31, 2007. Shannon, however, characterizes the Purchase Agreement as having been "backdated."

[17]  Section 523 Motion at 8, ¶ 16; Response at 9.

[18]  Section 523 Motion at 9, ¶ 17; Response at 9.

[19]  Section 523 Motion at 7, ¶ 9; *see* Response at 7-8 (not disputing this contention).

[20]  Section 523 Motion at 8, ¶ 11; Response at 8, ¶ 11 (not disputing this contention).

or its subsidiary, Pacific Crest Sports, LLC, on January 24, 2008, and Axcent was then dissolved.[21]

On the same day the asset sale was completed, Walton signed an employment agreement with Veltec, through Pacific Crest Sports, LLC.[22]  It is undisputed that Veltec obtained a license with Descente in 2008.[23]

According to Shannon, Walton's employment with Veltec and Veltec's obtaining a Descente license were part of an elaborate fraud scheme.  Shannon contends Walton, through concealment and deception, enticed Shannon to sell his interest in Axcent to Walton in exchange for the Promissory Note, which Walton never intended to pay.  Shannon also asserts Walton liquidated Axcent's assets and used the proceeds to pay down Colorado Business Bank's loan to Axcent and reduce the balance due on Walton's residence, which was cross-collateralized with Axcent's line of credit, rather than paying off the note to Shannon as promised.  Shannon further contends Colorado Business Bank and Walton colluded to orchestrate the bank's 2009 foreclosure on the Boulder Property for the purpose of eliminating Shannon's fourth-position deed of trust. Finally, Shannon alleges Walton's conduct resulted in various tax benefits for Walton to which he should not have been entitled, and in Shannon's loss of tax benefits.

Walton disputes the existence of such a scheme.  He denies concealing any relevant information from Shannon, and contends Shannon suffered no harm related to his loss of tax benefits.

## PROCEDURAL BACKGROUND

Walton filed his Chapter 7 bankruptcy petition on May 3, 2010.  On August 6, 2010, Shannon commenced the within adversary proceeding by filing a complaint against Walton in which he asserted claims pursuant to 11 U.S.C. § 523(a)(2) and (4)[24] (the "Original Complaint") (Docket No. 1).  The Original Complaint is three pages in length and includes twenty-one numbered paragraphs in which Shannon alleges

---

[21]  Section 523 Motion at 8, ¶¶ 12-13; Response at ¶¶ 12-13.

[22]  Section 523 Motion at 8, ¶ 14.

[23]  Fifth Complaint, ¶ 29; Answer, ¶ 19; Section 523 Motion at 15; Response at 4, ¶ 4.

[24]  Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

Walton had a fiduciary obligation to him "under the applicable Colorado statute governing the operations of a Limited Liability Corporation."  Shannon asserts no payments were ever made on the Promissory Note he obtained from Walton, and Walton induced Shannon to enter into the parties' Purchase Agreement and to accept the Promissory Note by making false statements of material facts and deliberately omitting material facts.[25]  Shannon requested "judgment in the amount of $850,000, or as proven at trial, a finding of nondischargeabilty of the debt and interest at the rate of 1% per month, court costs and for such other and further relief as the Court may deem just and proper in the premises."[26]

Before a responsive pleading was filed, Shannon filed an amended complaint on August 27, 2010 (Docket No. 7) (the "Second Complaint").  The Second Complaint is almost identical to the Original Complaint, except paragraph 20 was amended to include three specific allegations of false statements of material facts or deliberate omissions.[27]

On September 3, 2010, Walton filed his first Motion to Dismiss (Docket No. 13). In that motion, Walton argued no fiduciary relationship existed to support a claim under § 523(a)(4) and Shannon had not identified any such statutory duties or fiduciary relationship.  Walton also argued Shannon failed to identify the "who, what, when, where and how of the alleged fraud" under his § 523(a)(2) claim.  On September 9, 2010, Shannon filed a response (Docket No. 15) arguing the Motion to Dismiss appeared to address the Original Complaint and contending the filing of the Second Complaint rendered the motion moot.  On September 24, 2010, Walton filed a reply (Docket No. 17) admitting the Motion to Dismiss addressed the Original Complaint and

---

[25]  Original Complaint at 2, ¶¶ 10, 19, 20.

[26]  Original Complaint at 3.

[27]  Specifically, the Second Complaint alleges:

"(a) Walton made misrepresentations as to the tax losses that would be available to members of the business after December 31, 2007, telling Shannon there would be no or minimum losses for 2008 when in fact there were sizable losses of which Walton took 100%; (b) Walton made misrepresentations regarding the dissolution plan for Axcent including the source and amount of funds that would be realized, the expected proceeds and the intent to use the proceeds to satisfy the $400,000 note; and (c) Walton concealed the fact he had been offered and had accepted employment with a competitor of Axcent, which employment posed a direct conflict of interest with Walton's duty to maximize the funds available from the operation or wrap-up of Axcent to pay the $400,000 note."

(Second Complaint at 3, ¶ 20.)

noting Walton was filing a second motion to dismiss regarding the Second Complaint (the second motion was filed on September 24, 2010).

In his Motion to Dismiss the Second Complaint (Docket No. 18), Walton argued the deficiencies regarding the fiduciary relationship had not been cured by the Second Complaint and the added statements in paragraph 20 failed to set forth a § 523(a)(2) claim.  On October 7, 2010, Shannon filed a response, asserting his Second Complaint met the "plausibility" standard in *Bell Atlantic Corp. v. Twombly*[28] (Docket No. 20); however, in the event that the Court agreed with Walton's arguments, Shannon requested leave to file a third amended complaint.

On October 15, 2010, the parties filed a Joint Motion to Vacate Hearing on Motion to Dismiss (originally set for October 18, 2010) (Docket No. 21), in which Walton stated he did not oppose Shannon's request to amend his complaint.  The Court granted the Joint Motion and vacated the hearing.

Shannon filed a Motion to Amend on October 19, 2010 (Docket No. 24),[29] followed by a third amended complaint ("Third Complaint"), filed on October 22, 2010 (Docket No. 25).  The Third Complaint is seven pages in length and separates the two claims for relief.  On November 5, 2010, Walton filed a Motion to Dismiss the Third Complaint (Docket No. 30), to which a response (Docket No. 35) and a reply (Docket No. 38) were filed.  The Court conducted a hearing on December 21, 2010, and, after post-hearing briefing, entered an Order on February 10, 2011, concluding:

IT IS ORDERED Plaintiff's Motion to Disqualify[30] (Docket #28) is DENIED.

IT IS FURTHER ORDERED Defendant's Motion to Dismiss First Amended Complaint [the Third Complaint] (Docket #30) is GRANTED, in part, as to Plaintiff's claim for relief under § 523(a)(4).  The first claim for relief under § 523(a)(4) is DISMISSED.

---

[28] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

[29] The Court granted the Motion to Amend on October 25, 2010 (Docket #26).

[30] The Plaintiff's Motion to Disqualify Defendant's Counsel was also addressed at the December 21, 2010 hearing.

IT IS FURTHER ORDERED Defendant's Motion to Dismiss First Amended Complaint [the Third Complaint] (Docket #30) is DENIED, in part, as to Plaintiff's claim for relief under § 523(a)(2).

IT IS FURTHER ORDERED Plaintiff's request to file an amended complaint is DENIED.

On August 8, 2011, Shannon filed a motion for leave to file another amended complaint (Docket No. 68), along with a Fourth Complaint (Docket No. 69). In the Fourth Complaint, Shannon alleged additional facts in support of another § 523(a)(2) claim, but did not include a § 727 claim. Walton opposed the amendments, but at a status conference on December 13, 2011, the Court granted Shannon's motion to amend the complaint, allowing him until December 23, 2011 to file the amendment.

At a subsequent hearing on December 13, 2011, Shannon's counsel advised the Court he believed Walton and his counsel had failed to disclose and produce relevant information and documents in his original supplemental disclosures. Shannon further asserted he obtained the information, which should have been disclosed by Walton, through third parties during discovery, in June, July and August 2011. When asked by the Court whether Shannon was trying to resurrect his § 523(a)(4) breach of fiduciary duty claim, Shannon's counsel responded, "No, Your Honor, we're sticking with 523(a)(2)." Based on these representations and the arguments made by both counsel, the Court granted Shannon leave to re-file the Fourth Complaint. Shannon's counsel requested ten days in which to redraft the complaint and file it because "there were some things that were discovered." The Court granted the request, stating it was Shannon's last chance to amend. There was no discussion of adding a § 727 claim to the complaint.

On December 22, 2011, Shannon filed his "Amended Complaint of December 2011" (the "Fifth Complaint") setting forth claims for relief under § 523(a)(2)(A) and, for the first time, § 727, requesting revocation of the discharge entered August 25, 2010. The § 727 claim is based primarily on allegations that Walton failed to disclose certain items on his Schedules and Statement of Financial Affairs, including information related to certain setoffs, his employment with a third party, the transfer of Axcent assets, and his consultation with at least three bankruptcy attorneys pre-petition. Walton filed an Answer on January 12, 2011, asserting, as an affirmative defense, the § 727 revocation of discharge claim is barred by § 727(e)(1). Walton's two motions for summary judgment followed.

## DISCUSSION

### A.   Standard for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[31]  In applying this standard, the Court is to "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion."[32]  The party seeking summary judgment bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of [the record] 'together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."[33]  Summary judgment is a drastic remedy and "should be applied with caution to the end that litigants will have a trial on bona fide factual disputes.  No margin exists for the disposition of factual issues.  If there is any issue as to a material fact dispositive of right or duty, the case is not ripe for summary judgment."[34]

### B.   The Section 727 Motion

On February 1, 2012, Walton filed the Section 727 Motion relating to Shannon's claim for relief under § 727(d)(1).  On February 14, 2012, Shannon filed his *Plaintiff's Response to Motion for Partial Summary Judgment* (Docket No. 125).

Walton argues objections to his discharge were due by August 9, 2010, and, none having been filed, his discharge entered on August 25, 2010.  He directs the Court to § 727(e), which provides:

(e)  The trustee, a creditor, or the United States trustee may request a revocation of a discharge--

(1)  under subsection (d)(1) of this section within one year after such discharge is granted; or

---

[31]  FED. R. CIV. P. 56(a), applicable in bankruptcy adversary proceedings pursuant to FED. R. BANKR. P. 7056.

[32]  *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

[33]  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[34]  *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir. 1973) (citations omitted).

(2) under subsection (d)(2) or (d)(3) of this section before the later of--

(A) one year after the granting of such discharge; and

(B) the date the case is closed.

Although Shannon's "Amended Complaint of December 2011" refers to § 727 generally and does not specify any particular subsection, Walton asserts Shannon's § 727 claim is based on § 727(d)(1) (revocation of discharge for fraud).[35]

Section 727(d)(1) provides:

(d) On request of the trustee, a creditor, or the United States trustee, and after notice and a hearing, the court shall revoke a discharge granted under subsection (a) of this section if –

(1) such discharge was obtained through the fraud of the debtor, and the requesting party did not know of such fraud until after the granting of such discharge. . .[36]

Thus, pursuant to § 727(e)(1), the deadline to file such a claim for revocation was August 25, 2011 (one year from the August 25, 2010 discharge).

Walton argues the one-year deadline to seek revocation of discharge is jurisdictional, citing *Gonsalves v. Belice* (*In re Belice*), in which the First Circuit Bankruptcy Appellate Panel stated:

The commencement of an action seeking the revocation of a discharge is subject to strict time limitations.  As this Panel has previously explained, § 727(e)(1) is not "a mere statute of limitations, but an essential prerequisite to the proceeding."  As such, a majority of courts have refused to apply the doctrine of equitable tolling to the deadline set forth in the statute.[37]

---

[35]  Count II of the Fifth Complaint is labeled "Revocation of Discharge," and requests, *inter alia*, "entry of an Order revoking the Discharge entered in this case. . ." Fifth Complaint at ¶¶ 62-70.

[36]  Subsections 727(d)(2)–(4) are not applicable to this case.

[37]  *Gonsalves v. Belice* (*In re Belice*), 2011 WL 4572003, *3 (1st Cir. BAP 2011) (not for publication) (citations omitted).

Although he acknowledges the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has not specifically addressed this issue, Walton contends the Tenth Circuit would also find the one-year limitation in § 727(e)(1) is jurisdictional.

A time period in a statute or rule may be treated as either an affirmative defense the defendant must raise at the pleadings stage, or as a "jurisdictional" time prescription "forbidding a court to consider whether certain equitable considerations warrant extending a limitations period."[38]  When a time limit is jurisdictional, "*i.e.*, dispositive whenever raised in the proceedings[,]"[39] the court generally lacks jurisdiction to adjudicate outside of that time period.[40]  For requests for revocation of discharge under § 727(d)(1), the statutory time limitation set forth in § 727(e)(1)"is not a mere statute of limitations, but an essential prerequisite to the proceeding."[41]  In addition, FED.R.BANKR.P. 9024, making FED.R.CIV.P. 60 applicable to bankruptcy cases, "makes clear that Rule 60(b) affords no basis for circumvention of the time limitations prescribed by section 727 for the commencement of any proceeding to revoke a discharge." Accordingly, the Court concludes § 727(e)(1) is "jurisdictional" and establishes a concrete time bar for filing actions seeking discharge revocation under § 727(d)(1).

---

[38] *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133-34 (2008) (stating that most statutory time limits seek to protect defendants against unduly delayed claims and are treated as affirmative defenses subject to rules of forfeiture and waiver, however, some statutory time limits which seek to "achieve a broader system-related goal" are "jurisdictional" and more absolute).

[39] *Kontrick v. Ryan*, 540 U.S. 443, 447 (2004), *overruled in part on other grounds as stated in Kay v. Sec'y of Health & Human Serv.*, 80 Fed. Cl. 601 (Fed. Cl. 2008) (holding FED.R.BANKR.P. 4004(a), addressing denial of discharge (not revocation of discharge), is not "jurisdictional" and thus "could not be invoked to upset an adjudication on the merits.")  The Supreme Court reasoned the time limitations in the Federal Rules of Bankruptcy Procedure are different than those in the Bankruptcy Code because "the filing deadlines prescribed in Bankruptcy Rules 4004(a) and 9006(b)(3) are claim-processing rules that do not delineate what cases bankruptcy courts are competent to adjudicate."  *Id.* at 454.  With respect to the one-year deadline established in 11 U.S.C. § 727(e)(1), "[t]his time limitation on seeking revocation of discharge is a matter of statute, not rule." *In re Fehrs*, 391 B.R. 53, 67 (Bankr. D. Idaho 2008) (distinguishing the deadline in Rule 4004(a) from the deadline in Section 727(e)(1)).

[40] *See John R. Sand & Gravel Co.*, 552 U.S. at 135-36.

[41] 6 COLLIER ON BANKRUPTCY, ¶ 727.18[1] at 727-80 (Alan N. Resnick & Henry J. Sommer eds.,16th ed.2011) (citations omitted); *see also In re Fehrs*, 391 B.R. at 67-68 (concluding Section 727(e)(1) establishes a firm bar on discharge revocation actions, and dismissing the 727(d)(1) complaint filed after the one year bar); *Car Care Center of Crystal Lake, Ltd. v. Miller (In re Miller)*, 336 B.R. 408 (Bankr.E.D.Wis. 2005) (holding Section 727(e)(1) is not only jurisdictional, but the statute is clear on its face and should be enforced according to its terms).

Shannon argues his revocation of discharge claim – raised for the first time in his Fifth Complaint filed almost sixteen months after expiration of the § 727(e)(1) deadline – is timely.  In support of his argument the claim is timely, Shannon contends the claim "relates back" to the original complaint dated August 6, 2010, and the evidence in support of the claim was purposely concealed by the Defendant and his attorneys. Shannon states during discovery conducted in July and September of 2011, he obtained hundreds of emails from Veltec and Colorado Business Bank which had been withheld by Walton.  Thus, rather than disputing the jurisdictional nature of § 727(e), Shannon focuses on FED. R. CIV. P. 15(c)(1)(B):

> (c) Relation Back of Amendments.
>
>> (1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:
>>> . . .
>>
>>> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading[.]

In the unpublished *First Nat. Bank in Okeene v. Barnes* opinion, the Tenth Circuit affirmed the district court and bankruptcy court's decisions to reject the plaintiff's request to add a § 523 claim to his § 727 claim under a Rule 15(c) relation back theory.[42]  Because the plaintiff had not filed a timely claim under § 523(a)(6) in its original complaint, the plaintiff could add such a claim to the complaint only if the claim related back to the date of the original complaint.[43]  The Court went on to state:

> Grant or denial of leave to amend is within the discretion of the bankruptcy court.  *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971); *In re Wahl*, 28 B.R. 688, 690 (Bankr. W.D. Ky. 1983).  Rule 15(a) provides that leave to amend shall be freely given when justice requires. Before granting leave to amend, the bankruptcy court must inquire whether there was undue delay by the movant and undue prejudice to the party opposing amendment.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962).  In the absence of undue delay or prejudice, amendment may be permitted if the

---

[42] *First Nat. Bank in Okeene v. Barnes*, 956 F.2d 277 (Table) (10th Cir. 1992).

[43] *Id.*, at *1.

amendment claim arises out of the transaction or occurrence set forth in the original complaint. *In re Barnes*, 96 B.R. 833, 836 (Bankr. N.D. Ill. 1989).

In this case, the bankruptcy court did not abuse its discretion in denying leave to amend. The facts forming the basis for the claim Plaintiff wished to assert in the amended complaint were known to Plaintiff before he moved to amend. *See Rufenacht, Bromagen, & Hertz, Inc. v. Russell*, 69 B.R. 394, 395 (D. Kan. 1987). Plaintiff cited § 523(a)(6) on the cover sheet to its complaint. Such citation, however, was insufficient to raise a § 523(a)(6) claim in the complaint.

In addition, actions under § 727 are different from actions under § 523 as to the fact basis for the claims, the allegations, the type and measure of the burdens of proof, and the ultimate effect of a judgment in the plaintiff's favor. *In re Harrison*, 71 B.R. 457, 459 (Bankr. D. Minn. 1987); *Rufenacht, Bromagen, & Hertz, Inc.*, 69 B.R. at 395; *In re McClellan*, 60 B.R. 719, 721 (Bankr. E.D. Va. 1986). Accordingly, an exception to discharge under § 523(a)(6) would not relate back to the original complaint's claim for objection to discharge under § 727(a)(5). The bankruptcy court did not abuse its discretion in denying leave to amend.[44]

Relying in part on *First Nat. Bank in Okeene v. Barnes*, the United States Bankruptcy Court for the Eastern District of Pennsylvania held:

> [I]f a creditor files a complaint which seeks a determination of non-dischargeability under 523(c), he will not be permitted to amend the complaint to add a claim under section 727(a) objecting to discharge, if leave to amend is first sought after the deadline for filing such complaints. *See, e.g., First Nat. Bank in Okeene v. Barnes*, 956 F.2d 277 (Table), 1992 WL 33251 (10th Cir. 1992); *In re Atteberry*, 194 B.R. 521 (D. Kan. 1996); *In Re Canganelli*, 132 B.R. at 383.[45]

As the U.S. Court of Appeals for the Ninth Circuit stated in connection with a late request for leave to amend a complaint, "[i]f the ordinary action of § 727(a) is extreme, it

---

[44] *Id.,* at *2.

[45] *Levin v. DiLoreto (In re DiLoreto)*, 277 B.R. 607, 610 (Bankr. E.D. Pa. 2000) (noting the types of relief under 523 and 727 "are quite distinct").

must surely be still more extreme to order, retroactively, a revocation of the discharge."[46]

There are several reasons the Court must grant Walton's *Motion for Partial Summary Judgment on Plaintiff's Claim for Revocation of Discharge* and dismiss Shannon's § 727 claim.  First, the case law discussed herein supports a finding that the one-year deadline to seek revocation of discharge establishes a jurisdictional bar which cannot be extended on equitable grounds.  However, even if such equitable tolling were allowed in contravention of the plain statutory language, the Court finds the majority of the facts supporting a § 727 claim were known to Shannon before August 25, 2011, when the one-year deadline in § 727(e)(1) had passed.  Therefore, Shannon's discharge revocation claim is barred by operation of § 727(e)(1), and Shannon has failed to provide the Court with any basis to apply the doctrine of equitable tolling to the § 727 claim.

Second, even if the Court were to consider Shannon's relation-back theory, grounds do not exist to allow Shannon to add a § 727 claim almost sixteen months after the one year anniversary from the date Walton obtained his discharge.  Claims under §§ 727 and 523 are distinct because the elements required to support each are different, the relief requested is different, and the burdens of proof are different.  Here, the § 727 claim is based primarily on Walton's nondisclosure of required information in his bankruptcy petition of May 3, 2010, while the § 523 claims are based on Walton's alleged pre-petition conduct.  Further, until the Fifth Complaint was filed, none of the pleadings filed by Shannon referenced a potential claim under § 727.  Thus, the Court finds the additional § 727 claim does not arise out of the conduct, transaction or occurrence set forth in the first four complaints filed by Shannon.  Accordingly, the claim cannot relate back to the original filing date.

Third, Shannon failed to advise the Court at the December 13, 2011 hearing of his intention to add a § 727 claim, and never requested leave to amend his complaint to

---

[46] *Ditto v. McCurdy*, 510 F.3d 1070, 1079 (9th Cir. 2007) (holding the bankruptcy court did not abuse its discretion in denying leave for plaintiff to amend her complaint to challenge the discharge more than 15 months after the debtor was granted her discharge); *but see Winters v. Brothers* (*In re Brothers*), 345 B.R. 406, 409 (Bankr. S.D. Fla. 2006) (quoting *Mayle v. Felix*, 545 U.S. 644 (2005)).  The United States Bankruptcy Court for the Southern District of Florida allowed creditors who brought a § 727(a)(3) and (5) complaint to amend the complaint 11 days after the deadline to include a § 523(a)(2) claim, noting that where a pleading, "as amended 'arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading,'" the claim relates back to the original complaint. The *Brothers* Court also noted, "[r]elation back depends on the existence of a 'common core of operative facts' uniting the original and newly asserted claims."  *Id.* (quoting *Mayle*).

add a § 727 claim. The Court, therefore, never granted Shannon leave to add a § 727 claim and the Court will not do so now.

## C.    The Section 523 Motion

Section 523(a)(2)(A) of the Bankruptcy Code provides a debt will not be discharged in bankruptcy to the extent it was "obtained by false pretenses, a false representation, or actual fraud."[47] To establish a nondischargeable claim under § 523(a)(2)(A), Shannon must establish by a preponderance of the evidence: a) Walton made a false representation; b) Walton made the representation with the intent to deceive Shannon; c) Shannon relied on the representation; d) Shannon's reliance was justifiable; and e) Shannon sustained a loss as a result.[48]

### 1.    *Alleged Misrepresentations Regarding Tax Losses*

In his Fifth Complaint, Shannon asserts:

45.   When Shannon made inquiry of Walton as to why the [Purchase Agreement] was backdated to December 31, 2007 Walton's response was that counsel (Grimshaw & Harring) told him it was cleaner and there would not be much in tax losses in 2008.

46.   In fact, Walton took tax losses exceeding $1,500,000.

 . . .

61.   Walton induced Shannon to enter into the purchase agreement and the acceptance of the promissory note by untrue statements of material facts and made deliberate omissions of facts to Shannon, including, but not limited to the following:

     a.      The representation as to 2008 tax losses and the backdating of the agreement;

     b.      Walton had exclusive access to the financial data from [Axcent] and omitted the disclosure to Shannon that Walton would be

---

[47] Section 523(a)(2)(A).

[48] *Field v. Mans*, 516 U.S. 59 (1995); *In re Riebesell*, 586 F.3d 782, 789 (10th Cir. 2009).

entitled to a 1.5 million tax loss which would offset all of his income and entitle Walton to a substantial tax refund ($49,000);

. . .

k.    Shannon suffered harm by his reliance on Walton's misrepresentations and omissions in that he lost his original $800,000 investment and then lost any realization of the liquidation of the assets of ASLLC and lost any payment on the $400,000 promissory note[;]

l.    By entering into the note Walton obtained money, property, services or extension and refinancing of credit to the extent obtained by false pretenses, false representation and/or actual fraud[.][49]

In the Section 523 Motion, Walton seeks dismissal of Shannon's § 523(a)(2)(A) claim.  Specifically, Walton asserts Shannon's alleged reliance on Walton's representations regarding 2008 tax losses was not justifiable because Walton's representations were opinions or predictions about tax losses, rather than a statement of past or present facts.

For his part, Shannon asserts that tax losses were not future events because the parties entered into the Purchase Agreement following the close of the tax year.  This argument is without merit, as the parties entered the Purchase Agreement at the beginning of 2008 – not the end, when 2008 tax losses would have been determinable.[50]

Shannon also argues Walton's statement regarding tax losses "was made in such a way that it appeared certain to Shannon that it was true and caused him to rely upon the statement."[51]  Again, the question on summary judgment is not whether Shannon *subjectively* believed Walton's statement to be true, but rather whether

---

[49]  Fifth Complaint at 7-8.

[50]  The Complaint does not contain any clear allegations regarding any specific misrepresentation made by Walton in regard to tax losses expected for 2007 – only that "there would not be much in tax losses in 2008."  Fifth Complaint at ¶ 45.

[51]  Response to Section 523 Motion (Docket No. 133) at 9.

Shannon's reliance was "justifiable" as a matter of law.  However, this question cannot be determined at this stage of the proceedings as a matter of law because it involves a mixed question of law and fact requiring the Court to consider what representations were made, the manner in which they were made, the context of the representations, and other circumstances such as the availability of relevant information to Shannon.[52]

Walton also argues Shannon's claim should be dismissed because Shannon had a zero dollar basis for tax purposes and therefore could not take additional losses on his personal tax return even if he had been allocated additional losses for 2007 or any losses for 2008.  However, since Walton offers no evidence in support of this assertion, the Court has no basis for determining whether this is, in fact, the case.  Therefore, the Court finds summary judgment inappropriate on claims arising from Walton's alleged misrepresentations regarding tax losses.

### 2.   Alleged Misrepresentations Regarding Sale of Axcent's Assets

Walton also seeks summary judgment on Shannon's claim for damages arising from Walton's alleged representation that sale of Axcent's assets would generate sufficient funds to enable him to pay the $400,000 promissory note.  Walton again argues his statements were mere words of prediction, opinion or projection which are not actionable under § 523,[53] citing Shannon's testimony, in which he acknowledges that Walton's statements regarding the accounts receivable, inventory and $400,000 were an expression of Walton's opinion at the time they were made.  Further, he asserts, Shannon had equal access to records that would have allowed him to evaluate the veracity of any statements.

As discussed above, in order to determine whether Shannon's reliance was justifiable, the Court will need to hear evidence and assess the credibility of the witnesses regarding the context in which Walton's statements regarding payment of the

---

[52]  Whether Shannon had access to relevant information appears to be in dispute.  *See* Section 523 Motion, Ex. B at 72-76.

[53]  In *Waller v. Wilder*, the sole bankruptcy case cited by Walton in support of his argument, the court had an evidentiary context in which to evaluate whether the plaintiff's reliance was justifiable.  *See Waller v. Wilder (In re Waller)*, 210 B.R. 370, 378 (Bankr. D. Colo. 1997) (noting that business plans presented at initial meetings were all optimistic projections and that plaintiff knew they were projections, not statements of actual performance or guarantees of future success).  The other two cases Walton cites, *Suna v. Bailey*, 107 F.3d 69 (1st Cir. 1997), and *Burman v. Richmond Homes, Ltd.*, 821 P.2d 913 (Colo. App. 1991), are inapposite, as they are non-bankruptcy cases that do not apply the justifiable reliance standard.

promissory note were made.  Accordingly, the Court declines to grant summary judgment as to the claim predicated on these alleged misrepresentations.

### 3.    *Concealment of Future Employment*

With respect to Shannon's allegations Walton concealed his future employment with Veltec, Walton argues Shannon has not provided details such as when the concealment occurred, or the "important facts" about his employment.  Further, Walton asserts there was no concealment, citing to testimony showing "Shannon repeatedly testified that he knew about and was fully aware of Walton's proposed employment prior to the time of the purchase transaction."  Specifically, Shannon's testified as follows:

Q [Walton's counsel]:  [quoting from Second Complaint] "Walton concealed important facts about his acceptance of employment with Veltec."

A [Shannon]:  That is correct.

Q:  Okay, what fact about his acceptance of employment is it that you say he concealed?

A:  What fact?

Q:  Is it the fact that he may be employed by Veltec.

A:  Well, he disclosed that to me after the – he disclosed that to me later on, but yes, I guess that's part of it.

Q:  Well, he disclosed that to you before he entered into the purchase agreement, right?

A:  Before the purchase agreement was signed, yes.

Q:  So you knew that he was going to or had the possibility of going to work for Veltec at the time you signed the purchase agreement?

A:  Between – after December 11th and before I signed the purchase agreement, yes.

. . .

Q:  So at the time you signed the purchase agreement, you knew there was an employment offer that could be or was on the table for Hugh Walton, right?

A:  Yes.
 . . .

Q:  And you understand – understood at the time this was written that Hugh Walton would be receiving a reasonably substantial salary for his services to Veltec, right?

A:  I was never privy to those conversations, and I don't even – yeah.  No, I never knew how much he was going to make.

Q:  Okay.  You knew he was going to be employed presumably at a salary, but you didn't know how much.  Is that your testimony?

A:  Yes.[54]

For his part, Shannon responds, "This disclosure should have been made sooner."  He also contends, "The allegations in the complaint relate to more than just the disclosure of employment, but to all of the other personal benefits that Defendant would receive from the transaction (his employment, a home with $400,000 in equity, etc.).  The allegations in the complaint state that entire nature of the transaction were not disclosed; they should have been."[55]

Though he does not frame the claim artfully in the Fifth Complaint, the Court finds Shannon asserts Walton concealed more than the fact of his future employment with Veltec.  Questions of fact remain as to whether Walton concealed information about the true nature of the transaction with Veltec and the benefits he stood to receive as a result thereof.  All of this goes to the issue of intent – a question properly before the Court in connection with Shannon's  § 523(a)(2)(A) claim.  Therefore, the Court declines to grant summary judgment on the § 523(a)(2)(A) claim to the extent it is

---

[54]  Section 523 Motion, Ex. B at 17:7-18:1; 23:6-10; 59:22-60:6.

[55]  Response to Section 523 Motion (Docket No. 133) at 23.

predicated on Walton's alleged concealment of facts related to the benefits he would receive from his employment and transaction with Veltec.

### 4.    Concealment of Personal Bankruptcy

Shannon contends Walton never intended to pay the Promissory Note.  He points out  Walton met with several bankruptcy attorneys in late 2007 and 2008, but concealed the fact he was considering filing for bankruptcy from Shannon.  Shannon states if he had known Walton was considering a bankruptcy filing, he would not have entered into the Purchase Agreement.  For his part, Walton disputes he had any obligation to disclose this information.

To prevail on his claim under § 523(a)(2)(A), Shannon will have to prove all of the required elements of the claim, including fraudulent intent.  A debtor's intent not to repay a debt may be inferred from the surrounding circumstances, including failure to disclose information about finances.[56]  Though Walton's failure to disclose his consideration of bankruptcy may not be sufficient evidence, by itself, to establish fraudulent intent, it is a factor the Court may consider in evaluating Walton's intent for purposes of § 523(a)(2)(A).  Therefore, the Court declines to grant summary judgment on the § 523(a)(2)(A) claim to the extent it is predicated on Walton's alleged concealment of his intention to file for personal bankruptcy.

## CONCLUSION

The deadline established in § 727(e)(1) is jurisdictional, and therefore bars the § 727 claim raised for the first time in Shannon's Fifth Complaint filed almost sixteen months after expiration of the deadline.  The Court cannot apply Shannon's relation back theory to the facts of this case for the reasons stated herein. These determinations, coupled with Shannon's failure to request leave or even advise the Court he planned to add such a claim, support the Court's decision to dismiss Shannon's § 727 claim.

The existence of questions regarding the parties' knowledge, Walton's intent, Shannon's reliance, and Shannon's damages, if any, preclude the Court from determining whether Walton's alleged debt to Shannon is nondischargeable under

---

[56] *Riebesell*, *supra*, at 791 (noting that intent to deceive "may be inferred from the totality of the circumstances); *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1375 (10th Cir.1996)(same).

Page 20 of  21

§ 523.  These issues – in this case and in most § 523(a)(2) cases – cannot readily be answered based on pleadings, transcripts and discovery.  Rather, the Court will have to assess the credibility of the witnesses and evaluate additional evidence before it can determine the merits of the § 523 claim in Shannon's Fifth Complaint.[57]

## ORDER

For the foregoing reasons,

IT IS ORDERED the *Motion for Partial Summary Judgment on Plaintiff's Claim for Revocation of Discharge* (Docket No. 120) filed by Hugh Alexander Walton is GRANTED.  The Plaintiff's claim for relief under 11 U.S.C. § 727 is DISMISSED.

IT IS FURTHER ORDERED the *Motion for Summary Judgment with Authorities* (Docket No. 126) filed by Hugh Alexander Walton is DENIED.

Dated: June 13, 2012                              BY THE COURT:

_____
Michael E. Romero
U.S. Bankruptcy Court

---

[57]   *See In re Sutherland-Minor*, 345 B.R. 348, 356 (Bankr. D. Colo. 2006) (citation omitted) ("[S]ummary judgment is difficult to obtain when the issue is the intent of one of the parties."); *In re Lopez*, 381 B.R. 417, *4 (10th Cir. BAP 2008) (unpublished opinion) (citing *Crossingham Trust v. Baines* (*In re Baines*), 337 B.R. 392, 400 (Bankr. D. N.M. 2006) ("[T]he issue of fraudulent intent is a material issue not easily subject to adjudication by summary judgment."); and *Lazaron v. Lucas* (*In re Lucas*), 386 B.R. 332, 338 (Bankr. D. N.M. 2008) ("Rarely is it appropriate to grant summary judgment on a claim for non-dischargeability based on 11 U.S.C. § 523(a)(2)(A) because intent to defraud often depends upon the credibility of witnesses.").