**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 10-20750-MER |
| HUGH ALEXANDER WALTON ) | |
| ) | Chapter 7 |
| Debtor. ) | |
| ) | |
| LARRY SHANNON ) | Adversary No. 10-01571-MER |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| HUGH ALEXANDER WALTON ) | |
| ) | Signed/Docketed |
| Defendant. ) | June 17, 2013 |

**ORDER**

    The Olympic games celebrate athletic drive, talent and dedication, and provide the opportunity to shine on an international stage. Some Olympians convert the publicity into their livelihood through corporate sponsorships and endorsement deals. Others, like the debtor in this case, pursue careers suited to their particular athletic prowess. The instant matter illustrates a dispute between the athletic talent and the hopeful investor, arising from their failed business venture. The Court has considered the evidence and legal arguments presented by the parties, and hereby makes the following findings of fact and conclusions of law.[1]

**JURISDICTION[2]**

    The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C.

---

[1] The Court admitted the parties' stipulated facts into evidence. During the course of trial, the Court admitted Plaintiff's Exhibits 1, 10, 11, 23, 27, 28, 31, 33, 34, 38, 39, 41, 48, 54 and 56, and Defendant's Exhibits A through O and Q through U. For the reasons stated on the record, the Court also admitted on a limited basis Plaintiff's Exhibits 5, 13, 24 and 42. In addition, the Court incorporates all findings of fact and conclusions of law from its previous Order Denying Motion for Summary Judgment dated June 13, 2012 (Docket No. 140).

[2] The parties do not dispute jurisdiction and venue. Fifth Amended Complaint (Docket No. 115), at ¶ 1-3; Answer (Docket No. 139), at ¶ 2-4.

§ 157(b)(2)(I) because it involves determinations as to the dischargeability of a particular debt under 11 U.S.C. § 523(a)(2)(A).[3]

## BACKGROUND

### A. Aerodynamic Business Plan

In 2003, Debtor/Defendant Hugh Alexander Walton ("Walton"), a former Olympic bicyclist, and Plaintiff Larry Shannon ("Shannon"), a sophisticated investor, formed Axcent Sports, LLC ("Axcent") to design, produce and distribute bicycle apparel under a license from Descente North America, Ltd. ("Descente").[4] Walton funded Axcent with an initial $825,000 investment, and served as the general manager and the face of Axcent.[5] Shannon was the financier and investor, but was not actively engaged in the day-to-day business of the company.[6] At all relevant times, Axcent's primary lender was Colorado Business Bank.[7]

### B. The Flat Tire

During the four years from January 1, 2003, through December 31, 2006, Axcent showed significant growth in sales each year, but realized a profit in only two of those years.[8] Then, in the fall of 2007, Axcent pre-booked orders of approximately $3,000,000, but had neither the existing funds nor the borrowing power to purchase the materials or pay for the fabrication to satisfy the orders.[9] Therefore, Axcent required additional funding.

By November 2007, Axcent was indebted to Colorado Business Bank in the approximate amount of $2,500,000 to cover the increased costs.[10] This

---

[3] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[4] Stipulated Pretrial Statement ("SPS") (Docket No. 189), at ¶ 1-2.

[5] *Id.* at ¶ 1.

[6] *Id.*

[7] *Id.* at ¶ 3.

[8] *See id.* at ¶ 4.

[9] *Id.* at ¶ 6.

[10] *Id.* at ¶ 5. Axcent's original Operating Agreement (the "Operating Agreement") prohibited the manager of Axcent from borrowing in excess of $500,000 without unanimous consent of the members. Fifth Complaint, at ¶ 12; Answer at ¶ 8.

debt was secured by all of Axcent's assets and personally guaranteed by Walton.[11]  According to Shannon, Walton caused Axcent to incur this debt to Colorado Business Bank without his consent and in violation of the Operating Agreement.[12]  Walton contends Shannon was aware of the debt and consented to it.  Regardless, by the end of 2007, Axcent was deeply in debt, and with expiration of the five-year Descente license looming, Walton began looking for either an additional loan or additional capital to sustain the company.

### C.   Patching the Flat

Throughout 2007, Walton engaged in an ongoing dialogue with Shannon regarding the need for additional capital to continue operating Axcent.[13]  On July 4, 2007, Walton requested from Shannon a cash infusion of $500,000.00, which Shannon refused.[14]  Walton also offered Shannon a greater ownership interest in Axcent in exchange for a loan or an additional investment.  Shannon rejected this request as well.  In addition, Walton sought Shannon's agreement to join with Walton in the guaranty on the loan from Colorado Business Bank.  Again, Shannon declined.

In the absence of progress toward resolving Axcent's financial difficulties, Walton pledged his personal residence in Boulder, Colorado ("Boulder Property") as additional collateral to Colorado Business Bank in exchange for the bank postponing the foreclosure of its security interest in the assets of Axcent.[15]  Colorado Business Bank was in third position with respect to the Boulder Property behind a Colorado Business Bank home equity line of credit and a second deed of trust in favor of Chase Bank.  The Boulder Property provided about $1,000,000 in additional security.[16]

---

[11]  *Id.* at ¶ 5.

[12]  Fifth Complaint, at ¶ 19.

[13]  SPS, at ¶ 7.

[14]  *Id.*

[15]  *See id.* at ¶ 10.  At all relevant times, the Boulder Property was jointly owned by Walton and his wife, Susan Walton.  Susan Walton never held an ownership interest in Axcent.  Until executing the promissory note and deed of trust in favor of Colorado Business Bank, she had no obligation to any of Axcent's creditors other than a home equity line of credit.  *Id.*

[16]  *Id.*

Walton later discussed with Shannon the possibility of obtaining a third-party investment in Axcent.[17] Shannon agreed and stated he would consider any reasonable offer.[18] Immediately, Walton approached a Netherlands-based company, Veltec Sports, Inc., about the possibility of structuring a business arrangement.[19] From November through December 2007, Walton continued to explore other alternatives for saving Axcent, including an arrangement to pay the Colorado Business Bank, Descente and other creditors.[20] However, Walton and Shannon could not agree on how to continue the business, and in late 2007, they began discussing liquidation of Axcent.[21]

### D. The Sag Wagon

Finally, in January 2008, Shannon accepted a proposal from Walton.[22] On January 14, 2008, Walton and Shannon entered into a Purchase Agreement (the "Purchase Agreement") effective December 31, 2007,[23] whereby Walton agreed to purchase Shannon's entire interest in Axcent in exchange for $400,000.[24] As consideration for Shannon's interest in Axcent, Walton executed a promissory note in the original amount of $400,000, secured by a fourth lien on the Boulder Property (the "Promissory Note").

As additional consideration, Shannon and Walton agreed Axcent's Operating Agreement would be amended to allocate 100% of the tax losses to Shannon for 2007 to the extent of his positive capital account.[25] The First Amendment to the Operating Agreement executed and delivered by Shannon states all losses would be allocated to Shannon beginning in 2007, "provided however, that Losses shall not be allocated pursuant to this paragraph to the

---

[17] *Id.* at ¶ 8.

[18] *Id.*

[19] *Id.*

[20] *Id.* at ¶ 9.

[21] Fifth Complaint, ¶ 2; Answer, ¶ 15.

[22] SPS, at ¶ 12. Both parties were represented by independent counsel. *Id.*

[23] Exhibit R.

[24] *See* Exhibit R.

[25] The parties stipulated Axcent's original Operating Agreement was amended in January 2008 retroactively to January 1, 2007, for the purpose of changing the Axcent loss allocation for 2007. SPS, at ¶ 13.

extent such allocation would cause any Member to have or to increase a deficit Capital Account at the end of such taxable year."[26]

**E.     Hitting the Wall**

Shortly thereafter, Walton, as sole owner, caused Axcent to sell its assets, including accounts receivable, inventory, and purchase orders in process to Veltec Sports, LLC ("Veltec") or its subsidiary, Pacific Crest Sports, LLC ("Pacific Crest"), pursuant to a Purchase and Sale Agreement dated January 24, 2008 (the "Veltec Agreement").[27]  In the Veltec Agreement, Veltec agreed to: a) collect Axcent's receivables for a fee of 15% of the amounts collected; b) purchase the inventory of Axcent; and c) process Axcent's existing purchase orders in exchange for a fee based on the gross profits realized.[28]  All amounts due to Axcent under the Veltec Agreement were to be paid to Colorado Business Bank to retire Axcent's debt.[29]  Further, Colorado Business Bank foreclosed on the Boulder Property.[30]

On January 24, 2008, Axcent closed the sale of assets to Veltec or its subsidiary, Pacific Crest, and Axcent was dissolved.  On the same day, Walton signed an employment agreement with Veltec, through Pacific Crest.  It is undisputed Veltec obtained a license with Descente in 2008.[31]

## PROCEDURAL HISTORY

Walton filed his Chapter 7 bankruptcy petition on May 3, 2010.  On August 6, 2010, Shannon commenced the within adversary proceeding by filing a complaint against Walton in which he asserted claims pursuant to 11 U.S.C. § 523(a)(2) and (4).  Before a responsive pleading was filed, Shannon filed an second amended complaint, which was followed by several contested matters and subsequent amendments to the complaint spanning over one and a half years.

---

[26]  Exhibit O, at ¶ 2.

[27]  Exhibit T.

[28]  *Id.*

[29]  *Id.*

[30]  Following the foreclosure, Susan Walton purchased the Boulder Property from Colorado Business Bank.

[31]  Fifth Complaint, ¶ 29; Answer, ¶ 19.

On December 22, 2011, Shannon filed his *Amended Complaint of December 2011*[32] (the "Fifth Complaint") setting forth claims for relief under § 523(a)(2)(A) and, for the first time, § 727, requesting revocation of the discharge entered August 25, 2010. Walton filed an Answer to the Fifth Complaint on January 12, 2011.[33] Subsequently, Walton filed two motions for summary judgment. The Court entered its Order on the Motions for Summary Judgment dismissing Shannon's § 727 claim for relief, and finding trial necessary on the remaining § 523(a)(2)(A) claim.

## DISCUSSION

### A.   Claim for Relief Under § 523(a)(2)(A)

Section 523(a)(2)(A) states in relevant part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
. . .
>    (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>
>    >    (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. . .

Section 523(a) exceptions to discharge must be "narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be resolved in the debtor's favor."[34] The claimant bears the burden of proving nondischargeability under § 523(a) by a preponderance of the evidence.[35]

In the instant matter, it is undisputed the parties executed the Purchase Agreement and Promissory Note in connection with Walton's purchase of Shannon's interest in Axcent. Further, the parties agree Walton failed to meet his obligations under the terms of the Promissory Note, Walton owes Shannon the principal amount of $400,000 and Shannon is a creditor of Walton. Based on these undisputed facts and the plain language of the Purchase Agreement

---

[32] Docket No. 115.

[33] Docket No. 139.

[34] *Oklahoma Dep't of Sec., ex. rel. Faught v. Wilcox*, 691 F.3d 1171, 1174 (10th Cir. 2012) (citing *In re Sandoval*, 541 F.3d 997, 1001 (10th Cir. 2008)).

[35] *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

and the Promissory Note, the evidence clearly establishes Walton owes a debt to Shannon for money loaned under the Purchase Agreement and Promissory Note. At issue is whether the debt was obtained by false pretenses, a false representation or actual fraud under § 523(a)(2)(A).

A claimant may sustain a claim under § 523(a)(2)(A) by proving false pretenses, false representation or actual fraud, and these three independent causes of action require proof of different elements.[36] The Bankruptcy Appellate Panel for the Tenth Circuit explained the § 523(a)(2)(A) framework as follows:

> To sustain a claim for false representation under Section 523(a)(2)(A), the claimant must prove by a preponderance of the evidence that: 1) the debtor made a false representation; 2) with the intent to deceive the creditor; 3) the creditor relied on the false representation; 4) the creditor's reliance was [justifiable]; and 5) the creditor was damaged as a result. *Fowler Bros v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996). Intent to deceive can be inferred from the totality of the circumstances. *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 922 (10th Cir. BAP 2010) (citing *Young*, 91 F.3d at 1375).
>
> False pretenses under Section 523(a)(2)(A) are implied misrepresentations intended to create and foster a false impression. . . . False pretenses can be "defined as any series of events, when considered collectively, that create a contrived and misleading understanding of a transaction, in which a creditor is wrongfully induced to extend money or property to the debtor." *Stevens v. Antonious (In re Antonious)*, 358 B.R. 172, 182 (Bankr. E.D. Pa. 2006) (citing *Rezin v. Barr (In re Barr)*, 194 B.R. 1009, 1019 (Bankr. N.D. Ill. 1996)).
>
> A claimant may also sustain a claim under Section 523(a)(2)(A) by proving that the debtor engaged in actual fraud. . . . Actual fraud occurs "when a debtor intentionally engages in a scheme to deprive or cheat another of property or a legal right." *Id.* at 690 (quoting *Mellon Bank, N.A. v. Vitanovich (In re Vitanovich)*, 259 B.R. 873, 877 (6th Cir. BAP 2001)).[37]

---

[36] *Bank of Cordell v. Sturgeon (In re Sturgeon)*, ___ B.R. ___, 2013 WL 1965928, at *4-5 (10th Cir. BAP May 14, 2013); *see also Diamond v. Vickery (In re Vickery)*, 488 B.R. 680, 691 (10th Cir. BAP March 13, 2013), *appeal docketed*, No. 13–1148 (10th Cir. April 11, 2013) (recognizing "[i]n order to give full effect to the plain meaning of the disjunctive 'or' in § 523(a)(2)(A), we conclude that 'actual fraud' is an independent basis for nondischargeability under that subsection.").

[37] *Id.* at *4-5.

While the elements for each theory under § 523(a)(2)(A) differ, the common thread is a debtor's intent to defraud a creditor.

Here, Shannon confuses the distinct elements for false pretenses, false representation and actual fraud. Shannon's Fifth Complaint, representing the culmination of five separate amendments, cites generally to § 523(a)(2)(A) and contorts the general allegations into the *Young* elements for false representation. The Fifth Complaint does not contain any of the separate elements for actual fraud or false pretenses, and simply concludes as follows: "By entering into the [Promissory Note] Walton obtained money, property, services or extension and refinancing of credit to the extent obtained by false pretenses, false representation and/or actual fraud."[38] Nevertheless, as more fully set forth below, the Court finds Shannon failed to satisfy his burden of proof on any theory under § 523(a)(2)(A).

The parties presented evidence regarding the events spanning 2007 through early 2008. In addition to the exhibits admitted at trial, the Court heard testimony from Shannon, Walton, Charles Holmes ("Holmes"), Paul J. Hanley ("Hanley"), and Susan Walton ("Susan"). The Court finds each of these witnesses were credible witnesses with the notable exception of Shannon. Shannon's testimony was evasive, particularly regarding certain offers made to him for the purchase of his interest in Axcent. In a proceeding hinging on knowledge and intent, Shannon's lack of credibility, coupled with the evidence presented at trial, support the Court's conclusion the subject debt is dischargeable.

### B.   Alleged False Representations

To establish a nondischargeable claim for a false representation under § 523(a)(2)(A), Shannon must establish the following elements by a preponderance of the evidence:

- the debtor made a false representation of fact;
- the fact was material;
- the debtor made the representation knowing it to be false;
- the debtor made the representation intending the creditor's reliance;
- the creditor relied upon the representation;
- the reliance was justifiable; and
- the reliance resulted in damage to the creditor.[39]

---

[38] Fifth Complaint, at ¶ 61.l.

[39] *Field v. Mans*, 516 U.S. 59, 70 (1995); *Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996); *Martino v. First Citizens Bank & Trust Co.*, 2012 WL 1945424, at *2 (Bankr. D. Colo. 2012).

The Fifth Complaint, pretrial statement, and Shannon's written closing request relief under § 523(a)(2)(A) for false representations, applying the elements established in *Young*. Shannon alleges Walton made misrepresentations in connection with his purchase of Shannon's interest in Axcent and his promise to repay $400,000 under the terms of the Promissory Note. Walton denies making any false representations.

With respect to Walton's purchase of Shannon's interest, the Court is unpersuaded Walton made any false representations of fact to Shannon regarding the value of future tax losses,[40] the value of Axcent's inventory and receivables, or his intent to repay the Promissory Note. Shannon failed to present sufficient evidence of misrepresentation on these matters, and therefore, failed to meet his ultimate burden of proof of the same. Moreover, Walton presented evidence entirely disproving these accusations.

First, Shannon alleges Walton's conduct resulted in various tax benefits for Walton to which he should not have been entitled, and in Shannon's loss of tax benefits. With respect to the tax losses, the parties were represented by independent counsel during negotiations of the Purchase Agreement and the First Amendment to Operating Agreement. On the advice of his attorney, Shannon declined a distribution from Axcent, and requested an adjustment to the 2006 tax returns for Shannon to take 100% of the losses in 2007.[41] The First Amendment to Operating Agreement expressly reflects the parties' intent that Shannon would receive all taxes loses for 2007 up to the point his capital contribution reached zero, with the result that Shannon would not have a deficit.[42] All future tax losses were then allocated to Walton,[43] who also personally guaranteed the Axcent debt. The First Amendment to Operating Agreement was backdated, not as part of an elaborate fraud, but for the stated purpose of implementing the parties' tax loss arrangement. The agreement on tax loss allocation was negotiated at arm's length with independent counsel, and memorialized in the First Amendment to Operating Agreement.

Further, Axcent's amended 2007 income tax return confirms this arrangement. Shannon's beginning capital account was $389,805 on January 1,

---

[40] The Fifth Complaint does not contain any clear allegations regarding any specific misrepresentation made by Walton in regard to tax losses expected for 2007 - only that "there would not be much in tax losses in 2008." Fifth Complaint at ¶ 45.

[41] E-mail from Shannon to Walton dated January 7, 2008. *See* Exhibit J.

[42] Exhibit O, at ¶ 2.

[43] *Id.*

2007.[44] Shannon received a distribution in 2007 of $28,000 and took a tax loss of $811,805 leaving his capital account at $0.[45] Therefore, under the First Amendment to Operating Agreement, Walton took the entire 2008 tax loss. The amount of Walton's 2008 tax loss is not relevant to the issue of misrepresentation because there is no possibility Walton knew or should have known precisely what the 2008 tax loss would be as of January 2008. Walton did not make any false or fraudulent representations to Shannon regarding future tax losses because he could not have known with any certainty what those losses would be.[46]

Second, with respect to the allegation Walton made a false representation regarding the value of Axcent's inventory and receivables, Shannon offered no direct evidence of what representation was made. Based on the Purchase Agreement and the Promissory Note, it appears Walton's opinion of value for Shannon's interest in Axcent was $400,000 in January 2007.[47] Although Walton admitted his opinion of the potential future value and performance of Axcent was overly optimistic, his conduct in offering the Boulder Property as collateral and his efforts to find additional capital for Axcent reflect no intention to deceive Shannon. Further, on the facts of this case, Walton's opinion of future value is not enough to carry a finding of a false representation because Shannon's reliance was not justifiable.[48]

As noted by Chief Judge Howard R. Tallman of this Court,

> The *Fowler Bros.* Court used the term "reasonable" reliance, but the Supreme Court has held that § 523(a)(2)(A) requires justifiable, and not reasonable, reliance in the case of *Field v. Mans*, 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). This Court will apply that standard rather than the reasonable reliance standard articulated in *Fowler Bros. v. Young*. In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the

---

[44] *See* Exhibit Q, at Q-8.

[45] *Id.*

[46] The Court declines to address the remaining elements of § 523(a)(2)(A) with respect to future tax losses because the evidence overwhelmingly proves no false representation was made, and Shannon suffered no damages as a result of his negotiated tax loss arrangement.

[47] *See* Walton's Exhibits A through J.

[48] *See Waller v. Wilder (In re Waller)*, 210 B.R. 370, 378 (Bankr. D. Colo. 1997) (noting that business plans presented at initial meetings were all optimistic projections and that plaintiff knew they were projections, not statements of actual performance or guarantees of future success).

> Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover. *Id.* at 72, 116 S.Ct. 437.[49]

Shannon testified he had access to Axcent's financials at the latest by mid-June 2007 through the date of the Purchase Agreement. As early as September 4, 2007, Shannon was exploring his own options to move Axcent to California, and remove Walton as a partner, based on those financials.[50] During their ongoing dialogue about how to continue operating Axcent, Walton approached Shannon with multiple proposals for raising capital, and Shannon rejected each proposal.[51] Shannon was controlling the entire transaction, and had the final word on every proposal Walton presented at a time when Shannon had full access to Axcent's financial records.

Despite all the information indicating Axcent was insolvent, Shannon testified by the end of November 2007, he believed the value of his interest in Axcent was about $1.3 million (consisting of his initial $850,000 capital contribution, plus interest and costs).[52] This position ignores Axcent's financial reality. At a time when Axcent's liabilities exceeded its assets, Shannon's value

---

[49] *In re Sutherland-Minor*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006). *See also Fowler Brothers*, 91 F.3d at 1373 and *Field v. Mans*, 516 U.S. at 74.

[50] *See* Walton's Exhibit A. On September 4, 2007, Shannon wrote the following to a potential third-party investor:

> Hugh has offered me the company if I bail him out. **We have been looking at the books** and going over [sic] Hugh on what to cut and continue with and frankly I don't think he gets it. But do me a favor and keep this one to yourself for now.

Walton's Exhibit A (emphasis added).

[51] *See* Walton's Exhibit C.

[52] This testimony was corroborated by an e-mail from Shannon to Walton's attorney dated November 27, 2007, whereby Shannon stated:

> I would be willing to sell my equity interest for no less than $1,330,828.87 plus my expenses this year related to Descente . . . in addition I expect to be paid the money that Hugh owes me according to the operating agreement to cover my taxes plus interest . . .

Walton's Exhibit C.

was entirely overstated and can hardly be considered a justifiable belief. Even if Walton offered an overly optimistic opinion of the future value and performance of Axcent, Shannon, as a sophisticated investor with access to Axcent's financials, knew the company was not worth $1.3 million. Before he sold his interest in Axcent to Walton, Shannon recognized Axcent's financial troubles. In his own words:

> [t]he boat is going down but the captain has no clue that it is sinking. Again, I'm sorry for Hugh [Walton] wasting everyone's time. We have been dealing with him since June on bailing the company out and just couldn't make it happen. He is set on taking the ship down with him."[53]

For these reasons, Shannon's reliance on Walton's projections of value was not justifiable.

Third, with respect to the promise to repay the debt, Shannon alleges Walton falsely represented his intent to repay Shannon $400,000 under the terms of the Promissory Note, and that Shannon relied on Walton's promise to repay. However, Shannon failed to rebut Walton's direct testimony confirming his intent to repay the $400,000.00, and the Court finds Walton intended to repay the debt.

In making this determination, the Court relies most heavily on Walton's trial testimony versus Shannon's trial testimony. According to Walton, at the time the Purchase Agreement was executed, his intent was to pay off the Promissory Note with a new mortgage against the Boulder Property. He also testified his motivation was to prevent foreclosure on his residence, not to avoid paying Shannon. This testimony provides direct evidence of Walton's intention to repay Shannon.

The Bankruptcy Appellate Panel for the Tenth Circuit Court of Appeals has held, "[i]ntent to deceive under [§ 523(a)(2)(A)] may be inferred from the totality of the circumstances, and includes reckless disregard of the truth."[54] Here, Walton testified he intended to repay the Promissory Note. Walton's conduct demonstrates his efforts to save the company; he even offered to sell his interest to Shannon. Shannon rejected several proposals from Walton, even after Walton put up the Boulder Property as additional collateral to postpone the foreclosure against Axcent's assets. Further, Walton and Shannon retained separate counsel throughout the drafting and negotiation of the Purchase Agreement. The totality of the circumstances indicates Walton had no intention

---

[53] Walton's Exhibit G.

[54] *In re Daviscourt*, 353 B.R. 674, 685 (10th Cir. BAP 2006).

to deceive Shannon. Rather, the Court finds Walton intended to repay Shannon under the terms of the Promissory Note.

Moreover, Shannon testified he never received a cash offer from anyone for his interest, and the only offer he received was the proposed buyout from Walton at $400,000. This testimony is belied by the facts. By the end of September 2007, Shannon was receptive to only one structure - selling his interest in Axcent to a third party. With the Colorado Business Bank foreclosure looming, Walton pursued third parties, including Doug Reichardt and Veltec, as possible "angel investors" to raise capital. Walton testified he approached Shannon with an offer from Mr. Reichardt to purchase Shannon's interest in Axcent for $200,000. Walton testified Shannon refused this offer. Shannon denied he was ever approached with this cash offer, but the Court finds Walton's testimony more credible on this point. Furthermore, despite Shannon's lack of memory at trial, the evidence indicates Shannon also refused an offer from Veltec to purchase his interest in January 2008.[55]

After pledging his personal residence as collateral, Walton again offered to sell his interest in Axcent in exchange for the Promissory Note. Shannon finally accepted this proposal. As before, Shannon was represented by independent counsel in the transaction involving the Purchase Agreement. Shannon failed to present any evidence Walton "enticed" him to provide the $400,000 in exchange for his interest. Rather, the most damning evidence against Shannon was his admission at trial he believed Axcent was worth nothing at the time he executed the Purchase Agreement, he believed this transaction was his only chance to get paid for his interest, and he believed Walton would repay the $400,000.

Therefore, based on the totality of the circumstances, the Court finds Walton did not knowingly make false representations to Shannon, and the evidence demonstrates Walton had no intent to deceive Shannon. Further, even if Walton made false statements with the requisite intent, which the Court does not find in this case, Shannon's reliance was not justifiable. Accordingly, Shannon failed to satisfy his burden of proof for false representation under § 523(a)(2)(A), and the debt owed to Shannon is not excepted from Walton's discharge.

## C.   Alleged Actual Fraud

The parties dispute whether Shannon asserted a distinct claim under the § 523(a)(2)(A) for "actual fraud." While the Fifth Complaint does not plead

---

[55] Shannon's Exhibit 10, correspondence from Shannon to Walton dated January 5, 2008, at p.4 (Shannon wrote "I have no interest in talking to Veltec. Their offer is a joke. . . . I need to think about what the next step should be. But selling out to Veltec is not the thing to do."). At trial, Shannon could not recall any of the terms of this offer.

elements for actual fraud, Shannon argued in his pretrial statement Walton's conduct was part of a larger fraudulent scheme or plan to avoid repayment under the Promissory Note. In support, Shannon asserts Walton concealed his future employment with Veltec, concealed his personal bankruptcy, and conspired with Colorado Capital Bank to foreclose on Walton's Boulder Property to eliminate Shannon's fourth position deed of trust. However, Shannon did not present sufficient evidence to support his arguments regarding an elaborate fraud scheme.

According to Shannon, Walton concealed his future employment with Veltec, and concealed knowledge regarding Veltec's subsequently obtaining a Descente license in 2008. This statement is disproved by the correspondence from Shannon to his potential third-party investor, where Shannon stated: "[Walton] has been talking to Veltec all along . . . . Also the proposal has a job for Hugh and they are getting a licences from Descente . . . ."[56] This e-mail was dated January 5, 2008, **before** the Purchase Agreement was executed. Thus, Shannon knew of the possibility Veltec would obtain the license and employ Walton before consummating the Purchase Agreement and the Court cannot find actual fraud.

With respect to Walton's contemplating bankruptcy, Shannon points out Walton met with several bankruptcy attorneys in late 2007 and 2008, but concealed the fact he was considering filing for bankruptcy from Shannon. Shannon states if he had known Walton was considering a bankruptcy filing, he would not have entered into the Purchase Agreement. Shannon testified his first knowledge of Walton's plans to file for bankruptcy protection came in 2008 from Walton's bankruptcy counsel, who contacted Shannon with a $25,000 settlement offer in connection with the Promissory Note. Shannon testified he did not respond to this cash offer. Once again, Walton had made an effort to get some money to Shannon even when considering bankruptcy. Moreover, the bankruptcy case was not filed until May 3, 2010. Thus, even if he was considering filing in late 2007, Walton did not actually file for another three years. The Court is unconvinced his bankruptcy filing was part of an elaborate scheme to defraud Shannon.

Shannon also asserts Walton liquidated Axcent's assets and used the proceeds to pay down Colorado Business Bank's loan to Axcent and reduce the balance due on the Boulder Property, which was cross-collateralized with Axcent's line of credit, rather than paying off the Promissory Note. Shannon further contends Colorado Business Bank and Walton colluded to orchestrate the bank's 2009 foreclosure on the Boulder Property for the purpose of eliminating Shannon's fourth-position deed of trust. The Court is unpersuaded.

---

[56] Walton's Exhibit H.

Specifically, Holmes, former president of Colorado Business Bank, denied the bank was involved in a conspiracy to defraud Shannon. He explained Colorado Business Bank's loan to Axcent was secured against all of Axcent's assets, including but not limited to accounts receivable, inventory, purchase orders, and furniture and fixtures. In late 2007, Walton personally guaranteed the debt, and offered the Boulder Property as additional collateral when Axcent failed to perform under the terms of the loan. Holmes testified the bank had "won the lottery" when Walton offered the Boulder Property as additional collateral, particularly in light of Axcent's financial difficulties in late 2007.

Holmes further stated Veltec later acquired Axcent's assets subject to Colorado Business Bank's lien, and Colorado Business Bank foresclosed on the Boulder Property because Veltec was not making payments after it acquired Axcent from Walton. Therefore, the Court finds no evidence of an elaborate scheme between Walton, Susan and/or Colorado Business Bank to defraud Shannon with respect to the Boulder Property.

Further, in considering the evidence presented and the matters discussed above, the Court finds Shannon failed to demonstrate Walton had the requisite intent to defraud Shannon in connection with the Purchase Agreement or the Promissory Note. Walton's testimony, and the testimony of Susan, Holmes, and Hanley, combined with Walton's conduct, demonstrate his genuine and repeated attempts to revive Axcent. Accordingly, the Court concludes Shannon failed to establish any intent on the part of Walton to deprive or cheat Shannon of property or a legal right, and Shannon's claim of actual fraud fails.

### D.    Alleged False Pretenses

The concluding paragraph of Shannon's Fifth Complaint is the only reference to "false pretenses" in this proceeding. Shannon did not argue "false pretenses" in his written closing or his reply to Walton's written closing. While Shannon likely waived any claim for "false pretenses" for failing to argue this issue, the evidence clearly fails to support such a claim, and indicates Shannon fully understood the transaction regarding the Purchase Agreement and Promissory Note.

Shannon was represented by counsel during the negotiation, drafting and execution of the Purchase Agreement and the Promissory Note. Shannon controlled the structure of any proposals, and had the final say on every proposal Walton presented to him, with the exception of Walton's offering the Boulder Property as additional collateral. Shannon failed to present any evidence he was "enticed" into the transaction. Therefore, the Court finds Walton did not create a contrived and misleading understanding of a transaction involving the Purchase Agreement or the Promissory Note.

### E. Attorneys' Fees and Costs

Walton requested an award of fees and costs in his Answer to the Fifth Amended Complaint, and again at the close of trial. Although Walton requests an award of attorneys' fees, Walton failed to demonstrate any entitlement to fees and the Court determines an award for fees is improper. Therefore, no fees shall be awarded, and each party shall bear their own attorneys' fees.

Although there is no bankruptcy statute or rule specifically providing for attorney fees in the context of § 523(a)(2), FED. R. BANKR. P. 7054(b) provides for an award of costs to the prevailing party.[57] As set forth herein, Walton is the prevailing party, and Shannon was put on notice of the potential award of costs because Walton's Answer requested an award for costs. In this case, the Court in its discretion finds an award of costs in favor of Walton is appropriate. Thus, the Court will allow reimbursement of costs incurred by the Walton in connection with this adversary proceeding in accordance with FED. R. BANKR.P. 7054 and 28 U.S.C. § 1920.[58]

---

[57] FED. R. BANKR. P. 7054 provides:

**(a) Judgments.** Rule 54(a)-(c) F.R.CIV.P. applies in adversary proceedings.

**(b) Costs.** The court may allow costs to the prevailing party except when a statute of the United States or these rules otherwise provides. Costs against the United States, its officers and agencies shall be imposed only to the extent permitted by law. Costs may be taxed by the clerk on 14 days' notice; on motion served within seven days thereafter, the action of the clerk may be reviewed by the court.

[58] 28 U.S.C. § 1920, taxation of costs, provides:

A judge or clerk of any court of the United States may tax as costs the following:

(1) Fees of the clerk and marshal;

(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title;

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

## CONCLUSION

For the reasons stated above,

IT IS ORDERED the debt of Walton to Shannon is dischargeable. A separate Judgment shall enter in favor of the Defendant Hugh Alexander Walton and against the Plaintiff Larry Shannon, with each party to bear their own attorneys' fees.

IT IS FURTHER ORDERED that within fourteen (14) days from the date of this Order, Walton shall file a bill of costs pursuant to FED. R. CIV. P. 7054 containing his total expenses under 28 U.S.C. § 1920 incurred in connection with this adversary proceeding.

Dated June 17, 2013                    BY THE COURT:

_____
Michael E. Romero
United States Bankruptcy Judge

---

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.